UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JANET GUSS                                                    CIVIL ACTION

VERSUS                                                        NO. 06-1570

JO ANNE B. BARNHART,                                          SECTION "J"(3)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The plaintiff, Janice Guss ("Guss"), seeks judicial review of an adverse decision of the

defendant, Jo Anne B. Barnhart, Commissioner of Social Security, on grounds that the decision

is arbitrary, contrary to law and not supported by substantial evidence.  The sole error alleged is

"Listing Error,"  *i.e*., the failure of the ALJ to properly consider whether the plaintiff's condition

met the requirements of Listing  3.03(B).  The Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  Pursuant to 28 U.S.C. § 636(b), this matter was referred to the undersigned United

States Magistrate Judge for review and submission of a report and recommendation. Having

reviewed the administrative record, the pleadings, the parties' cross motions for summary

judgment and the applicable law, the undersigned United States Magistrate Judge finds that

substantial evidence in the record supports the decision of the Commissioner and thus

1

RECOMMENDS that the Commissioner's cross-motion for summary judgment be GRANTED,

the Plaintiff's motion for summary judgment be DENIED and her case DISMISSED WITH

PREJUDICE for the following reasons.

## I. PROCEEDINGS

On November 19, 2003, plaintiff filed an application for disability benefits under the

Social Security Act alleging disability due to asthma and her temper.[1]  Plaintiff's applications

were denied initially and on reconsideration.[2]  Pursuant to the plaintiff's request,[3] a hearing was

scheduled before an Administrative Law Judge (ALJ).[4]

An evidentiary hearing was held on April 18, 2005 before ALJ Gary Vanderhoof, at

which time the plaintiff was represented by counsel.[5]   In addition to the plaintiff, a Vocational

Expert (VE) Katrina Verdan appeared and testified.[6]

On May 12, 2005, ALJ Gary L. Vanderhoof issued a written decision finding that the

plaintiff was "not disabled" under the governing rules.[7]  Specifically, the ALJ determined that

notwithstanding the plaintiff's "severe" impairment (asthma), her condition neither meets nor

---

[1]*See* Application for Supplemental Security Income Benefits [Adm. Rec. 46-49];
Disability Report, Section 2A [Adm. Rec. 56].

[2]*See* Disability Determinations [Adm. Rec. 24-29].

[3]*See* Request for Hearing by Administrative Law Judge (disagreeing with the
determination because plaintiff's "asthma keeps [her] from doing many thing[s] for [herself] and
with [her] children") [Adm. Rec. 30].

[4]*See* Notice of Hearing [Adm. Rec. 32].

[5]*See* Transcript of April 18, 2005 Hearing [Adm. Rec. 298-323].

[6]*Id*. [Adm. Rec. 23].

[7]*See* Decision of ALJ Vanderhoof dated May 12, 2005 [Adm. Rec. 17-22].

equals the criteria for any impairment set forth in 20 C.F.R. Appendix 1, Subpart P, Regulations

No. 4, including Listing 3.03 (Asthma).[8]

The ALJ explained his determinations that plaintiff's condition failed to meet the criteria

of Listings 3.02 (Chronic Pulmonary Insufficiency) and 3.03 (Asthma)[9] as follows:

> Records from Tulane University Hospital and Clinics, Pendleton Memorial
> Methodist Hospital, Touro Infirmary and Northshore Regional Medical Center of
> April 2, 2003, June 7, 2003, November 28, 2003,  December 19, 2004 and
> December 26, 2004 indicate that Ms. Guss presented with a history of asthma and
> dyspnea, wheezing and coughing.  Ms. Guss had no fevers or chest pains.  Ms.
> Guss had markedly diminished lung fields with marked diminishment of air flow
> with inspiratory/expiratory wheezes heard bilaterally....  Respiratory rate [was]
> elevated between 24 and 36.  Pulse oximetry was 100%.  Chest x-rays were
> unremarkable.  Ms. Guss was tachycardic.  The first two exacerbations were
> secondary to non-compliance while the third was attributed to a worker at the
> Social Security office using a flare pen in her presence when she was filling out
> forms for her social security benefits.  Ms. Guss received nebulization therapy
> and IV Solu Medrol in the emergency room after which she had no dyspnea and
> lungs were clear to auscultation.  Each emergency room presentation lasted less
> than twenty-four hours.  Ms. Guss was released from the facility on Combivent or
> Flovent inhalers and a brief five day course of Prednisone.
>
> Ms. Guss was actually hospitalized for several days at Touro Infirmary for asthma
> in March, 2005.  Ms Guss did not require intubation.  (Exhibits 1F, 5F &8F).
>
> On spirometry, Ms. Guss was sixty-four inches tall.  FVC and FEV 1 pre-
> bronchodilation were 2.95 liters and 2.45 liters, respectively.  FVC and FEV 1
> post-bronchodilation were 2.67 liters and 1.65 liters.  Such values exceed those of
> FEV 1 1.25 liters and FVC 1.45 liters.  It was noted that Ms. Guss had difficulty
> performing the inspiratory phase of pre-bronchodilation F/V loop due to coughing
> and dyspnea.  Results indicated a severe obstruction with no significant
> improvement post-bronchodilation.  Diffusing capacity was within normal range.
> (Exhibit 3F).
>
> Records from Advanced Allergy Associates, respiratory specialist Cheryl
> Williams indicate that Ms. Guss has allergies to trees, grass, weeds, dust, insects

---

[8]*See* Decision of ALJ Vanderhoof dated May 12, 2005 [Adm. Rec. 22].

[9]*Id.*

(mosquitos, house flies and ants), dogs, silk, daisies, shellfish, peanuts/nuts, broccoli, rice, carrots and garlic.  Immunotherapy was being considered. Immunoglobin E was highly elevated.  Respiratory specialist Cheryl Williams wrote on April 14, 2005 that Ms. [Guss] was severely asthmatic requiring steroids for management.  (Exhibits 8F pgs. 22 & 26 and 7E).

Ms. Guss' major obstacle to adequately managing her condition is her noncompliance.  Ms. Guss' asthma is severe.  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) and *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) state that medical conditions that can reasonably be remedied by either surgery, treatment or medications are not disabling.

A major criteria in meeting a listed impairment is compliance.

20 Code of Federal Regulations 416.930 – Need to Follow Prescribed Treatment – states than an individual must follow treatment prescribed by the physician if such treatment can restore their ability to work. When an individual does not follow their prescribed treatment without good reason, they will not be found disabled.

I find no good reason exists for claimant's failure to consume her medications for depression and asthma or to search out agencies to acquire financial assistance in purchasing her medications.  Failing to consume medications because of decreased sex drive is not a good reason for not consuming medications.   Ms. Guss is of average intellect with a twelfth grade education and has no disorder of the thought processes and adequate judgment.  Ms. Guss knew how to seek out representation for Social Security ....  Ms. Guss was self-referred for care a Pontchartrain Mental Health.  Ms. Guss was further informed of how she could perhaps qualify for medications free of cost from social workers at the Chartres Pontchartrain Mental Health Center.

\* \* \*

Claimant's assertions relative to symptomatology, pain, functional limitations and restrictions on daily living have been considered in light of the factors set forth in 20 C.F.R. § 416.929 and SSR 96-7p.  [Her assertions] are exaggerated, are found to lack corroboration or substantiation in the medical evidence and are not credited.

Ms. Guss asserts frequent visits to her internists and respiratory specialist as often as once a week.  Such frequency of visits are not supported by the records of her internists Glade or Thomas or respiratory therapist Williams.  Records from internist Glade indicate visits on September 11, 2003 and one month later on October 23, 2003.  Internist Thomas' records indicate visits on April 4, 2003, May 7, 2003, June 13, 2003, August 29, 2003, September 29, 2003 and November 24, 2003.  Records from respiratory specialist Williams indicate visits on

November 3, 2004 and December 6, 2004 and no visits in the interim or corroborating/supporting documentation of the severity of her condition....

Further, I note that on presentations to the various emergency rooms she always arrived in a private vehicle and appeared to be in no acute respiratory distress. Pulse oximetry ranged from 98% to 100%.  She was in no need of oxygen.

The records of internist Glade and Thomas confirm Ms. Guss as having asthma and her lungs being clear to auscultation bilaterally with some occasional wheezing and having frequent exacerbations of asthma and when occurring attributed to non-compliance with medication.  Although Ms. Guss asserted that certain medications caused her chest pains, other medications were ordered for her.  Ms. Guss' cardiorespiratory examinations were unremarkable.  EKG's and chest X-rays were unremarkable.  (Exhibits 3F and 4F).

Specifically, in the records of internist Thomas dated June 13, 2003, Ms Guss admitted that she had not consumed her medications and had failed to fill the Prednisone that she had received from her emergency room presentation earlier that week.

The annotation on September 11, 2003 of unable to work is not clear as to meaning.  It can be internist Glade's regurgitation of Ms. Guss' acknowledging to him that she cannot work, [since] internist Glade has never stated independently that Ms. Guss is disabled.  Further, it is felt that such is the regurgitation of Ms. Guss acknowledging that she cannot work as cardiorespiratory examinations were basically unremarkable for pathology, and [the findings were] only occasional wheezing. (Exhibit 4F).

Even if Ms. Guss had no Medicaid she would have qualified for care free of cost through the state funded Medical Center of New Orleans.  The record is rather replete for consistent care for asthma.

Ms. Guss' having to lie down for one-half of the day is not medically prescribed.

Ms. Guss' assertion that she cannot have curtains on her windows because of dust is not credited in light of her maintaining a sexual relationship with her gentleman friend and wanting privacy from prying young eye[s] that may be watching from outside.

The severity of Ms. Guss' major depression is not credited in light of the differences in her presentations at the mental health center when she is being interviewed by a social worker and then evaluated by a psychiatrist....  When asked about her leisure activity, Ms. Guss stated that such consisted of playing games with her children, who were ages fifteen, ten and seven, watching

television and waxing her floors.  Administrative notice is taken that Ms. Guss stated that she enjoyed wa[x]ing her floors.  [S]o apparently, the scent of [floor] wax is not that insulting to her.[10]

* * *

In March, 2004, Ms. Guss was released from the [Chartres Pontchartrain Mental Health] Center as she had Ochsner Health Care and she was referred to them for care and her case was closed.  Ms. Guss never required any further mental health care despite her enrollment in Ochsner Health Plan. (Exhibit 2F).

* * *

Administrative Notice is taken that in the representative's closing argument she did not mention depression/anxiety or temperament, but only focused on asthma. Many emergency room presentations can be feigned by failing to consume prescribed medications which [I find] in Ms. Guss' case.  Ms. Guss' motivation for acquiring Supplemental Security Income is twofold – financial and Medicaid.

* * *

The state medical consultants, internist Eisenhauser [Exhibit 6F] and psychologist Guidry [Exhibit 7F], determined that Ms. Guss was not disabled.  From a physical standpoint it was felt that Ms. Guss could perform work of a light nature where she had to avoid work in concentrated areas of heat/cold, fumes, odors, dusts, gases and poor ventilation.  Ms. Guss' depression was [found] to be non-severe.....[11]

The ALJ determined that Guss retains the functional capacity to perform work at the light exertional level with additional restrictions of no climbing of ropes, scaffolds or ladders, plus the aforesaid environmental limitations consistent with the findings of the state medical consultants. The vocational expert who testified identified a significant number of positions that the plaintiff could perform including security guard, dispatcher, receptionist, telephone sales and information clerk.  Thus, the ALJ determined that the plaintiff was not disabled at any time though the date of decision.[12]

---

[10]The ALJ determined that Guss' activities of daily living are not impacted by her depression or her asthmatic condition and noted that she continues to get out in the park with her children, attends church, go shopping for groceries and do the banking, inter alia. [Adm. Rec. 16].

[11]*See* Decision of ALJ Vanderhoof [Adm. Rec. 15-21].

[12]*Id.* [Adm. Rec. 21].

On June 2, 2005, plaintiff filed a request for review by the Appeals Counsel, alleging that

the ALJ committed error.  In her letter brief in support of appeal, plaintiff argued that her asthma

condition meets Listing 3.03(B) and that additional medical records demonstrate that she suffers

from asthma attacks at least six times a year.  Plaintiff highlighted that she suffered seventeen

asthma attacks in 2004.  Guss contends that, in May 2004 alone, she suffered five asthma attacks

as that term is defined by the Act.  Plaintiff elaborates that she suffered an attack following

exposure to perfume and then smoke as she exited the building of the Office of Hearings and

Appeals.  Thereafter, EMS administered a nebulization treatment to improve Guss' symptoms

prior to arriving at Tulane University Hospital for treatment on April 18, 2005.[13]  The Appeals

Council declined review and the ALJ's decision became the Commissioner's final

determination.[14]

Plaintiff filed this suit in federal district court on March 3, 2006.[15]  Having exhausted all

administrative remedies, this matter is ripe for review.

## II. JUDICIAL REVIEW

### A. Standard of Review

The function of the court on judicial review of a denial of benefits is to determine

whether "substantial evidence" supports the final decision and whether the Commissioner used

---

[13]*See* Request for Review of Hearing Decision [Adm. Rec. 9-10]; Correspondence of
Counsel dated August 2, 2005 [Adm. Rec. 294-297].

[14]*See* Notice of Appeals Council Action dated January 19, 2006 [Adm. Rec. 4-8].

[15]*See* Plaintiff's Complaint [Rec. Doc. No. 1].

the proper legal standards to evaluate the evidence.[16]   If the Commissioner's findings are

supported by substantial evidence, they must be affirmed.[17]  "Substantial evidence" is more than

a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.[18]   A district court may not try the issues *de novo*, re-

weigh the evidence or substitute its own judgment for that of the Commissioner, even if the

district judge believes that the evidence weighs against the Commissioner's decision.[19]

Nevertheless, the Court must carefully scrutinize the entire record to determine whether

substantial evidence exists to support the ALJ's findings.[20]  "In short, conflicts in the evidence

are for the Commissioner and not for the courts to resolve."[21]

If proper principles of law were applied, and if the Commissioner's decision is supported

by substantial evidence, the findings are conclusive and must be affirmed.[22]

## B. Eligibility for Disability Benefits

To qualify for Social Security income or disability insurance benefits, the plaintiff must

---

[16]42 U.S.C. § 405(g); *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir. 1999).

[17]*Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[18]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001); *Newton,* 209 F.3d at 452.

[19]*Masterson,* 309 F.3d at 272; *Newton,* 209 F.3d at 452.

[20]*Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied,* 514 U.S. 1120 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992).

[21]*Masterson*, 309 F.3d at 272 (citations and internal alterations omitted).

[22]*See id.* (*citing Richardson,* 402 U.S. at 401)

meet the requirements set forth in the Social Security Act.[23] Specifically, the plaintiff must be

under age 65, file an application for benefits and be under a disability as defined by the Act.[24]

Those claiming disability insurance benefits under the Act have the burden of showing the

existence of disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which ...

has lasted or can be expected to last for a continuous period of not less than 12 months."[25]

Establishment of "disability" is a dual process. First, the claimant must prove that she suffers

from a medically determinable impairment.[26] Second, the claimant must prove that her

impairment or combination of impairments render her unable to engage either in the work she

previously performed or other substantial gainful employment and that such jobs exist in

significant numbers in the national economy.[27]

The Commissioner utilizes a five-step sequential evaluation to aid in the determination of

whether a claimant is disabled.[28] A finding that the claimant is not disabled at any step is

conclusive and ends the inquiry.[29] The five-step analysis was cogently restated in *Shave v. Apfel*:

> First, the claimant must not be presently working at any substantial gainful
> activity. Second, the claimant must have an impairment or combination of

---

[23]*See* 42 U.S.C. § 423(a) (2001).

[24]*See* 42 U.S.C. §§ 416(I), 423(a) (2001).

[25]42 U.S.C. § 423(d)(1)(A) (2001).

[26]42 U.S.C. §§ 416(I)(1), 423(d)(1)(A) (2001).

[27]42 U.S.C. §§ 416(I)(1), 423(d)(2) (2001).

[28]*Newton,* 209 F.3d at 453 (5th Cir. 2000).

[29]*Watson,* 309 F.3d at 272; *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

impairments that are severe.  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations.  Fourth, the impairment must prevent the claimant from returning to his past relevant work.  Fifth, the impairment must prevent the claimant doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.[30]

In conjunction with steps four and five, the Commissioner utilizes a "residual functional capacity" (RFC) assessment to determine whether the applicant, notwithstanding severe impairment, has the physical and mental ability to perform work-related activities on a regular and continuing basis as generally required by competitive, remunerative work.[31]  Thereafter, the Commissioner determines if the claimant has the physical and mental ability to perform her past relevant work.[32]  If the claimant's RFC meets or exceeds the requirements of her regular previous employment, the disability claim is denied.[33]  If not, the inquiry proceeds to step 5 where the Commissioner has the burden to show that the claimant can do work as it is generally performed in the national economy.[34]

---

[30]*Shave v. Apfel*, 238 F.3d 592, 593 (5th Cir. 2001).

[31]RFC is defined as "what you can still do despite your limitations" and has three components, to wit: physical abilities, mental abilities, and other abilities affected by impairments.  20 C.F.R. § 404.1545(a) (2002); Soc. Sec. Ruling 96-8p, 61 F.R. 34474 (July 2, 1996).

[32]*See Chaparro v. Bowen,* 815 F.2d 1008, 1010 (5th Cir. 1987).

[33]*See* 20 C.F.R. § 404.1561 (2002).

[34]*See* 20 C.F.R. § 404.1566 (2002).

### C. Treating Source's Statements and Determinations

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment and responses should be accorded considerable or great weight in determining disability.[35]  The ALJ may assign less weight to a treating physician's opinion when there is good cause shown to the contrary.  "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."[36]  The opinion of a specialist is generally accorded greater weight than a non-specialist.[37]

The ALJ is not at liberty to reject a medical opinion without giving an explanation and is not at liberty to make a medical judgment regarding the ability or the disability of a claimant to engage in gainful activity where such inference is not warranted by clinical findings.[38]  Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.[39]  Treating physicians opinions are not conclusive regarding matters reserved to the Commissioner.[40]   Good cause may permit the ALJ to discount the weight of a treating physician

---

[35]*See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 455.

[36]*Newton*, 209 F.3d at 455 (citations and inner alterations omitted).

[37]*Id.* (*citing Paul v. Shalala,* 29 F.3d 208 211 (5th Cir. 1994).

[38]*Loza,* 219 F.3d at 395.

[39]*Newton*, 209 F.3d at 456.

[40]*Id.* (*citing Brown*, 192 F.3d at 500).

relative to other experts where the treating physician's evidence is conclusory, is unsupported by clinical findings or is otherwise unsupported by the evidence.[41]

Circuit law and Social Security Regulations require that the ALJ give good reasons for discounting the decision of a treating physician and, in so doing, give specific consideration to the following factors: (1) length of treatment; (2) frequency of examination; (3) nature and extent of treatment; (4) support of the physician's opinion afforded by the medical evidence; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.[42]  "Additionally, SSR 96-5p provides, with respect to Residual Functional Capacity Assessments and Medical Source Statements, that Adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. § 404.1527, providing appropriate explanations for accepting or rejecting such opinions."[43]

### III.  PERTINENT FACTUAL BACKGROUND

Guss was thirty-six years old at the time of the hearing and testified that she had a twelfth grade education.[44]  Plaintiff's only prior work experience was employment at Brooks Restaurant in 1999 and 2000[45] and a brief stint cooking at Burger King.[46]  Plaintiff testified that she quit

---

[41]*Id.*

[42]*See* 20 C.F.R. § 404.1527(d)(2).

[43]*Newton*, 209 F.3d at 456 (citations, inner quotation marks and ellipses omitted).

[44]*See* Transcript of April 18, 2005 Hearing [Adm. Rec. 302].

[45]*See* Covered Earnings Statement (indicating total earnings in the amount of $5,171.02 and $1,431.06 for the years of 1999 and 2000, respectively) [Adm. Rec. 21].

[46]Hearing Transcript [Adm. Rec. 303].

working because of "too much stress, [her] asthma and emphysema."[47]  Guss testified that she

cannot clean, wash clothes, dust, sweep or lift grocery bags. She stated that the aforesaid

activities trigger her asthma.  Plaintiff explained that her children (sons) must perform all of the

household chores, except cooking and washing the dishes.[48]  She further testified that she takes

four to five breathing treatments daily and one in the middle of the night.  Guss testified that she

rarely leaves the house because it always makes her sick.  Plaintiff stated that she quit work

because of stress, which "brings on [her] asthma" and "[t]hat's why [she] was getting sick more

at work."[49]

## IV. ARGUMENT

Generally, the plaintiff contends that the ALJ erred in denying her claim for benefits

because she has been disabled since June 20, 2003.  More specifically, the plaintiff argues that

the ALJ erred by failing to find that she met the listing level impairment contained in 20 C.F.R.

Pt. 404, SubPt. P, App. 1, Listing 3.03B ("Listing 3.03B").[50]  In response, the Commissioner

contends that the ALJ's conclusion is based upon substantial evidence and therefore must be

affirmed.[51]

## V. ANALYSIS

---

[47]*Id*. [Adm. Rec.303-304].

[48]*Id.* [Adm. Rec. 304-307].

[49]*Id.* [Adm. Rec. 309].

[50]*See* Plaintiff's Memorandum in Support of Motion for Summary Judgment [Fed. Rec. Doc. 11].

[51]*See* Commissioner's Memorandum in Support of Cross-Motion for Summary Judgment [Fed. Rec. Doc. 12].

Listing 3.03B (Asthma) may be met when an individual suffers six asthmatic "attacks" within a period of twelve consecutive months.  However, Listing 3.03B has other criteria including but not limited to the requirements that each alleged attack must (1) last one or more days and (2) necessitate intensive treatment.  The ALJ determined that the plaintiff failed to meet the requirements of Listing 3.03B.  The ALJ's findings and his reasons delineate the basis for this conclusion.  Most notably, the ALJ concluded that "Ms. Guss' major obstacle to adequately managing her condition is her non-compliance."[52]  In this regard, the ALJ highlighted that 20 C.F.R. § 416.930 which states that an individual must follow prescribed treatment if such treatment can restore the ability to work and that, when an individual does not follow the prescribed treatment without good reason, she will not be found disabled.

Substantial evidence supports the ALJ's conclusions regarding the absence of evidence of acute active pulmonary process and plaintiff's failure to follow the prescribed treatment without good reason.  Tulane University Hospital and Center (TUHC) Emergency Room Record dated April 2, 2003 noted the absence of past medical history of asthma complications and no prior intubations or hospitalizations.  TUHC diagnosed "acute broncho spasm" and discharged plaintiff the same day in stable condition with prescribed medications, including Flovent and Prednisone.[53]  TUHC Emergency Room Notes dated April 18, 2005 document plaintiff's complaint of shortness of breath, that her medications include Albuterol and that "she ha[d] a prescription for Flovent [which] she has not filled yet."[54]  On May 11, 2004, TUHC obtained

---

[52]*See* ALJ Vanderhoof's Decision [Adm. Rec. 17].

[53]Tulane University Hospital Emergency Room Note [Adm. Rec. 237].

[54]Tulane University Hospital Emergency Room Visit Report [Adm. Rec. 232].

frontal and lateral views of plaintiff's chest, which revealed "no acute pulmonary process."[55]

Emergency physician's notes dated July 8, 2004 indicate that plaintiff walked into the

emergency room in *mild* distress with *moderate* symptoms "*after inhaling car fumes.*"[56]

Progress notes dated October 11, 2004 indicated that plaintiff presented "wheezing," admitted

that she "ran out of all of her med[ications]" and further concluded that Guss had suffered a

"*mild* asthma exacerbation."[57]  Progress notes of plaintiff's treating physician, Dr. Krishnaveni

Bethi, indicate that, for the period of October 15, 2004 through January 24, 2005, Guss' asthma

condition was stable.[58]  Dr. Bethi specifically noted plaintiff's statement that she did not fill her

December 26th, 2004 prescription for steroids and took only the prednisone that was left over.[59]

Northshore Regional Medical Center's Emergency Department Discharge Instructions dated

December 26, 2004 similarly note that plaintiff's chief complaint was asthma which started that

day.  The aforesaid records further noted that Guss forgot her nebulization and metered dose

---

[55]Chest X-Ray Report dated May 11, 2004 (stating tracheal air column is midline, cardiomediastinal silhouette is within normal limits, hilar shadows are normal, costophrenic angles are sharp/clear and lungs are clear bilaterally) [Adm. Rec. 239].  *See also* Chest X-ray Report dated September 18, 2003 (stating cardiac silhouette unremarkable, no focal infiltrates or effusions, mediastinum/pulmonary hila unremarkable and "no radiographic evidence of acute pulmonary disease") [Adm. Rec. 229]; Chest X-Ray Reports dated June 15, 2004 and October 18, 2004 similarly noting "no evidence of acute/active pulmonary process") [Adm. Rec. 226-227].

[56]Emergency Physician's Notes dated July 8, 2004 (italicized emphasis added) [Adm. Rec. 222].

[57]Progress Notes dated October 11, 2004 [Adm. Rec. 220].

[58]Dr. Krishnaveni Bethi's Progress Notes [Adm. Rec. 274-230].

[59]*Id.* [Adm. Rec. 276].  *See also* Methodist Hospital Emergency Physician's Records dated December 30, 2004 (noting plaintiff failed to make use of her home nebulizer this afternoon) [Rec. Doc. 178].

inhaler [MDI] treatments.[60]

>Turning to the language of the applicable regulation, Listing 3.03B requires:

>Attacks (as defined in 3.00C), *in spite of prescribed treatment* and requiring
>physical intervention, occurring at least once every 2 months or at least six times
>a year. Each inpatient hospitalization for longer than 24 hours for control of
>asthma counts as two attacks, and an evaluation period of at least 12 consecutive
>months must be used to determine the frequency of attacks.

20 C.F.R., Pt. 404 , Subpt. P., App. 1, Listing 3.03B (italicized emphasis added). Thus, the

language of the listing indicates two distinct elements, namely (1) a severity requirement and (2)

a frequency requirement.  It further contemplates compliance with prescribed medication

therapy.

The language of Listing 3.03B explains in detail the subtleties of the frequency requirement.

>To satisfy the frequency requirement, the claimant must demonstrate that six "attacks"

occurred, "in spite of prescribed treatment," within a period of twelve consecutive months. *Id.*

The Court recognizes that one medical episode does not necessarily constitute a single "attack"

for purposes of the listing in that any inpatient hospitalization for greater than twenty-four hours

will constitute two "attacks." *Id.*

>The severity requirement of 3.03B demands that each medical episode used to satisfy the

frequency requirement rises to the level of an "attack." The term "attack" is defined in Listing

3.03B by reference to Listing 3.00C. Id. Listing 3.00C defines an "attack" as:

>[A] prolonged symptomatic episode[ ] lasting one or more days and requiring
>intensive treatment, such as intravenous bronchodilation or antibiotic
>administration or prolonged inhalation brochodilator therapy in a hospital,
>emergency room, or equivalent setting.

---

[60]*See* Northshore Regional Medical Center Emergency Physician Record [Adm. Rec.
264].

20 C.F.R. Pt 404, Subpt. P., App. 1, Listing 3.00C (emphasis added). When parsed, the listing

displays two major elements necessary to determine that a particular medical episode in fact rose

to the level of an "attack": (1) the episode must last "one or more days," and (2) the episode must

create a necessity for "intensive treatment." *Id.*   The listing provides an illustrative list of

"intensive treatments," which makes clear that hospitalization is not necessary for a particular

treatment to be considered "intensive." *See id.* ("in a hospital room ... or equivalent setting").

Ultimately, Listing 3.03B contains *five* necessary elements. Namely, a claimant, such as

the plaintiff, must show: (1) a twelve-month period, (2) a computation of six "attacks" during

that period, (3) a duration of one or more days for each "attack," (4) intensive treatment

necessitated by each "attack," and (5) that these "attacks" occurred  *in spite of compliance with*

*prescribed treatment.  See* Listing 3.03B.   In this case, substantial evidence supports the ALJ's

determination that the plaintiff's condition fails to meet or equal the frequency and severity

criteria of Listing 3.03B *in spite of compliance with prescribed treatment*.

In summary, the ALJ's finding that plaintiff does not have an impairment or combination

of impairments that meet or equal the criteria Listings 3.02 (Chronic Pulmonary Insufficiency) or

3.03 (Asthma) is supported by substantial evidence.[61]   The ALJ correctly highlighted the

governing regulation, *i.e.*, that a "major criteria in meeting a listed impairment is compliance."[62]

## VI. CONCLUSION

Plaintiff has failed to show either that the ALJ applied improper standards or that his

decision is not supported by substantial evidence.  Accordingly,  IT IS RECOMMENDED that

[61]ALJ Vanderhoof's Decision dated May 12, 2005 [Adm. Rec. 22].

[62]*Id.* [Adm. Rec. 17].

the Commissioner's motion be GRANTED, her decision be AFFIRMED, the Plaintiff's motion

be DENIED and that Guss' complaint be DISMISSED WITH PREJUDICE.

## VII. OBJECTIONS

Objections must be: (1) specific, (2) in writing, and (3) served within ten days after being

served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b)

A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district

judge; and (2) appellate review of the unobjected-to factual findings and legal conclusions

accepted by the district court, except upon grounds of plain error.  *Douglass v. United Services*

*Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this <u>26th </u>day of February, 2007.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**